Case 15-1963, USA v. Marvin Nicholson Case 15-1966, USA v. Brian Jackson 15-1998, USA v. Sherman Brown 15-2064, USA v. Matthew Schimonte 15-2065, USA v. Brian Sorrell 15-2089, USA v. Antonio Johnson Oral argument not to exceed 30 minutes will be shared by the defendants and 30 minutes for the plaintiff. So Mr. Brown will start when ready for the appellant. Thank you. Maybe you all could give us a road map. I have the rebuttal tab. Very well, Your Honor. I wanted to introduce myself. I'm Mark Brown. I represent the defendant Antonio Johnson in this case, and I'm the lead-off hitter here today. You're going to hear from all six of us here this morning in this oral argument. We have all talked and agreed that there are some common issues amongst all the defendants. So there are going to be certain of us that talk about those common issues. And then, time permitting, there may be some discussion about individual issues or specifically about individual issues. But specifically for me, Your Honor, I'm going to say one of my five minutes for rebuttal. I'm going to talk about the RICO issues with respect to all of the defendants. So that's going to be where I go. And as I said, I represent Antonio Johnson. Now, wait a minute. How much time do the others have? They have basically five minutes, except Mr. Paulson will have six and Katie back there will have four. She traded off one of her minutes to Mr. Paulson. Sorry if my road map wasn't good, Your Honor. I apologize. Okay. So how long? I've been talking. Five. Mr. Pitts is talking. No, she's talking four because she's got a minute of rebuttal. And Mr. Pitts and Mr. Burton are talking five each. Right? Okay. Okay. Thank you. Ms. Burton. I'm sorry, Ms. Burton. So I'm going to have four minutes here at the start and save one of my minutes for rebuttal, if that pleases the Court, Your Honor. I want to thank you for the opportunity to be here today and I also want to thank you for the opportunity to advocate on behalf of Mr. Antonio Johnson in this case. As this Court is aware, Mr. Johnson was convicted under the RICO statute and is serving a 420-month sentence in federal prison. And while I will make no such concessions here, it is our belief that in this case, this is not a RICO matter. This is simply what the government proved was a little bit, not a little bit, just a number of small conspiracies. And the reason that is, is because as the Court is aware, as the Supreme Court made clear in its 1981 Turkett decision, I hope I'm pronouncing that correctly, that the government is required in a RICO case to prove not only a pattern of racketeering activity, but they're required to prove an enterprise separate and apart from that criminal activity. In this case, the government has alleged an association in fact enterprise, which as you're aware, doesn't require anything formal. It can be a loose organization of people, but the association in fact enterprise does have three specific requirements. It has to have a purpose, a relationship amongst the parties, and longevity in order to establish or to satisfy those purposes. And in this case, the reason the defendants assert that there is no RICO case is there is no purpose shown in the facts on this case. Now, as I read the government's brief correctly, what they're contending the purpose is, is that they seem to apply that the purpose was to promote an enterprise and respect, to promote themselves as the baddest motorcycle gang in the land and do it with fear and intimidation. But when you look at the... It can be a purpose sufficient, Your Honor, if in fact the facts support that. But in this case, what we have is we have a number of individual members of the Phantom's Outlaw Motorcycle Club essentially doing just whatever they want to do. There's no common purpose amongst it. In other words, it's not organized for the purpose of committing criminal acts like robbery, extortion, and murder. The idea that they have bylaws interested me in terms of coordinated action. And I think, you know, the bylaws... I understand the court's concern with the bylaws and the fact that it does in fact look like it may be an organization, but if you just go by bylaws... Your client was the national president and he was giving a lot of orders to people, which is best I could tell they were doing their best to carry out. Yes, I understand that, Your Honor, but if you also look... Well, virtually all those things were criminal acts. Yes, and if you look at some of those things, Your Honor, for example, one of the things that they used to convict my client on was conspiracy to commit murder. But if you look at the facts of that particular matter, there's absolutely no proof that there was any specific instructions given to anyone in the Phantom's Outlaw Motorcycle Club to go murder anyone that day. And if you look at the other things that happened in this case, like, for example, if you look at the testimony, one of the things the government emphasizes is these guys steal motorcycles. Well, these guys were stealing motorcycles for their own use and benefit. In fact, one of the defendants testified that he was making $22,000, $2,500 a pop off stealing motorcycles. The jury heard all that and they made a determination based on those facts and we now have to view those facts in the light most favorable to the government. I mean, that's a tough road to climb. I will concede it's a tough road to climb, Your Honor, but they did hear the facts about the racketeering activity. And where this RICO claim fails is I don't think on the facts they showed an absolute purpose, a purpose that this was set up for this specific reason. And I see my time is up, so I'll yield the floor to the rest of the lawyers. Thank you, Your Honor. All right. You'll forgive me if I get the genders wrong. I don't have the first names. I don't have any clues. So you appear to be Mr. Paulson. That's right, Your Honor. I'm Colter Paulson from Squire Patton Boggs and the Sixth Circuit Clinic at the University of Cincinnati. And I'm arguing on behalf of Mr. Sherman, I will also take one of the joint issues. First, though, I'd like to talk about the terrible injustice that happened to Mr. Brown as he was mixed in with this panoply of so many people and so many things going on. Individuals can get lost in the mix. In fact, when Mr. Sherman Brown moved for acquittal, the trial court got confused and denied his motion by discussing a co-defendant, Raynard Brown, and what he had done. The government's brief, likewise, talks about Raynard Brown quite a bit, even though he's not part of the appeal and often refers to both Sherman Brown and Raynard Brown as merely Brown. This court should correct the trial court's error and not confuse the evidence against Mr. Sherman Brown with the rest of the case. He's only been charged with the conspiracy count, and there was no evidence that he was part of that conspiracy. There was conflicting evidence about whether he was at the big meeting where people talked about retribution, but there was no testimony that he said anything at that meeting. And just merely being present at a meeting is not enough. You could be sitting there thinking, well, I mean, I'm wondering if it isn't a meeting of all these perpetrators. There's a point about the meeting and who else attended and that he fit in, and apparently he was voluntarily attending. So if you look at it this way, we have a motorcycle club that's been doing the things that motorcycle clubs do, and then there's this murder. They have a meeting. Everybody comes to the meeting to talk about it. A few people say, let's go hurt some people. Some people say, sure. People like my client don't say a thing, probably thinking, what the heck, this isn't what we usually do. Which Brown was recorded talking about the mass murder plot? So Mr. Raynard Brown was recorded saying lots of horrible things about the mass murder and organizing it and getting guns. My client, there is one conversation that he was recorded on, and that's what the whole case about him boils down to, where it's reprinted on pages 12 and 13 of a reply brief, where Brown, Miller, and Nicholson are talking about the Hell Lovers plan to frame the Satan sidekicks for the murder, to get the phantoms in jail. They're talking about this complicated plan, and my client says, they're talking about this hypothetical, and then they talk about Martians, and then my client says, if we did, he says, we're going to need some Martians pretty soon. Not clear what that refers to. If we did, I'd be getting in. For real, I mean, I just don't even like thinking about it, this person here, and then he says, hit him in jail, hit him hard as hell. If you read the transcript, you'll see that Mr. Brown was either referring to a hypothetical about going to jail, about the Martians, and if you listen to the tape, you'll hear he's incapacitated. So the murder conspiracy presented by the government was, kill one or two people, wait until everybody shows up, and then come in an ambush, and kill the rest of them. If you read the transcript, and I urge you to, my client had, there's no indication he understood that that was the plan, or that he agreed with that plan. And Mr. Miller's discussion of it actually said that he wasn't advocating to sit back and meticulously wait, which was the plan, as he just said, well, let's have a brawl, like we always have brawls. So I'd like to move on very quickly. My goodness. So this court has a recent decision in the United States v. Carter on the sentencing issue, which is 662 Federal Appendix 342, which gives his minimal, it changed the guidelines, the comments to the guidelines. And I think if you apply that case, it needs a remand so the court can look at that again. And then I'd like to address the veneer argument. Real quick, the 2014 committee notes are very, I think this court should decide when defendants need to move to challenge their veneer, based on that, which the committee notes say it's when jeopardy attaches. There are cases, unpublished cases going both ways. Boulding, Suggs and Darwich are on our side. There's Fan Troy, which goes the other way. Before you run out of time, can I go back to the facts? So when he said, hit him hard as hell, and you're saying he's inebriated, wasn't that in front of the jury? That was in front of the jury, yes. And they made a determination and made a determination that the combination of him being at the meeting, the phone call, and hit him hard as hell was sufficient. What phone call, Your Honor? Or the recording, I'm sorry. Okay, yeah, there was being at the meeting and not saying anything, and then there was hit him hard as hell, which was interpreted by the government witness as not being what the conspirators were talking about at the meeting. And so I would, and so essentially the argument is, if there's a, being present isn't enough. You have to indicate, yes, I'm going along with the plan, to be part of the conspiracy. You can't just be in the gang. He wasn't on the RICO count. So just to finish up, the government just filed a 28-J letter talking about HOFA. HOFA, it was a published case, and it does talk about Rule 12, but it was a very different version of Rule 12. If you look at the old Rule 12b-3 from 1944, it requires motions to be made before the plea is entered or within a reasonable time thereafter. It's not applicable. And the reasoning doesn't apply anymore because right now we've moved these things to the chief judge. Veneer challenges are complicated, expert-laden affairs, and they're not going to interfere with the trial because they're not part of the trial anymore, essentially. Because we've kind of moved from that. So I think this Court isn't bound by HOFA. We have a different rule, a different way of talking about veneer challenges. So I think this Court should remand back so the trial court can remand back because the trial judge said it's waived. We're not going to talk about it, so they can get to the substance of the issue. Thank you. Ms. Rabin. Good morning, Your Honors. I'm Margaret Rabin. I represent Appellant Marvin Nicholson. I will be speaking about the joint issue involving Remmer v. United States and the trial court's dealing with a juror who claimed that he was followed home from court on one of the trials. This Court can rely on the trial court's assessment of the juror's ability to be fair only if the scope of the trial court's questioning was thorough. In this case, the defense attorneys knew exactly what the critical question needed to be. It was, do you think these defendants had anything to do with the incident reported by the juror? The trial court refused to ask this question and thereby denied the appellants the ability to prove juror bias, which was their burden. This was a trial about violent men and violent acts. Counsel, why don't you remind us now what the court did ask. I'm suspecting the court asked a question in the same vein. Well, I think the court thinks it asked a question in the same vein. What the court asked in various minor word changes was, do you, you don't think these defendants had anything to do with this, do you? It was a leading question specifically phrased to get the answer of no. And to not elicit any other thoughts of the jurors. I think the trial court was focusing on getting to the next set of questions for the jurors, which was, do you think you can be fair? I think that that's an appropriate inquiry. But I think in order to get that, the trial court should have accepted the wording of the question that the defense attorneys posed. I understand the trial court may not have wanted six or eight trial attorneys asking jurors questions, but I think there is a marked difference between asking the defense attorneys questions and asking, do you think, and you don't think, do you? I thought they asked if they understood that the defendants weren't involved and whether it would make them be fair, whether they would be fair and unbiased. And one said I would approach, be a little more cautious, and the judge excused that juror. Is that correct? I thought she said she would be more cautious. Well, whatever she said, the trial court accepted that as being equivocal, at least. So the trial court's questions got answers, and the trial court specifically said the defendants were not involved in this. Well, the trial court made an announcement. That doesn't address what jurors particularly think about whether the defendants were involved. The juror who was followed home was the only black juror in the jury on this. And the government stressed how violent this case was right out of the start by asking that the jurors remain semi-anonymous. There had been 10 days, I'm sorry, my time is up. Can you wrap up very quickly? Yes, I will. There had been 10 days of continuous testimony about violence and violence and violence and violence, and that's the background in which this incident involving the juror occurs. So telling the jurors, the defendants, or implying that the jurors were not involved in this case, to the jurors that the defendants were not involved, did not ask them, do you think they're involved? Because that was the critical question, and that's why these defendants were deprived of their ability to really get into the question of bias. Standard of review for the question you pose is what? I'm sorry, I didn't hear. Okay, to review the handling of the matter by the district court. The matter of law? Yes, I think the standard of review is abuse of discretion. Thank you. All right, Mr. Pitts. Yes, your honor. Your honor, may I please, panel may I please, this honorable panel, Byron Pitts, I represent defendant Brian Jackson. I will be addressing what's a common issue for I believe most of the defendants that deals with the failure for the district court judge to instruct the jury as it relates to subjective intent. We ask that subjective intent language be added to the instruction 2.08. The reason that's important is because, this is a conspiracy, the judge properly instructed on Michigan conspiracy law, prong two of Michigan conspiracy law says that the defendant must specifically intend to commit a crime. Specific intent is the mental state. You then go to pattern jury instruction 2.08 to determine how does one ascertain what is the mental state. 2.08 as read to the jury gives a reasonable man standard, which is at odds with the specific intent instruction of Michigan conspiracy law. This substantially affected my client, Brian Jackson, because it left the jury confused as to whether or not they are to interpret Brian Jackson's statements, which the government is going to argue are threats. Are these statements to be viewed through the reasonable man standard or are we to look at the statements through the eyes and subjective intent of Brian Jackson? The failure to give that instruction created a confusion for the jury, which substantially affected, and I was the trial attorney, to argue on behalf of Mr. Jackson the particular facts which had affected Mr. Jackson. Mr. Jackson, within the record, it was clear he had a drinking problem, he was given the hyperbole, you have no context, because the evidence came from audio tapes. Is Mr. Jackson smiling, is he laughing, is he intoxicated? I cannot significantly argue these factors without the instruction that the jury is to look at this through the eyes, the subjective intent of Mr. Jackson, not a reasonable man standard. The government, in addressing the government's arguments, the government said, you know, we relied and we cited aloneness and so did the government. The government indicates, well, aloneness talks about threats, aloneness addresses threatening statements, and as such, it's not applicable to this case because this case dealt with conspiracy. Well, the conspiracy is based upon, if you drill down a little deeper, this conspiracy is based upon threatening statements. Allegedly, some members of the conspiracy said, we're going to do this to a rival gang and we're going to do that, we're going to kill them, we're going to do that. Mr. Jackson allegedly made some other comments, which are, they're arguing, are threats, which amounted to an agreement with the other members of the conspiracy. So we're all talking about threatening statements, aloneness said a threatening statement cannot be viewed using a reasonable person's standard, it's got to be viewed using a subjective intent standard, and that's what we tried to get. Also, I believe the government is going to argue that, well, you know, Mr. Jackson is not a reasonable man. Well, the instructions that were given significantly covered the salient points. I don't believe that's the case because the government did instruct as, under conspiracy, as it relates to the specific intent requirement. But the specific intent requirement is defined, or should be defined, the mental state requirement should be defined under 2OI and is defined incorrectly. So what, can I, so you're saying, just so I understand it, while specific intent was defined in the instructions, it was not in 2OI, which is where the jury looked, and that caused the error. No, no, no, let me be clear. It's mentioned that it, it's mentioned under the conspiracy instruction, but the definition of mental, specific intent is a mental state. Mental state is defined, how to infer mental state, under 2OI, and 2OI gives a reasonable person, applies a reasonable person standard and definition, which is inappropriate under ELONUS. So it's mentioned under the Michigan Conspiracy, appropriately, how to define mental state, how to interpret mental state, the Sixth Circuit Pattern Jury Instruction 2.08, it is not consistent with ELONUS. Was I that great, Judge, I mean, any questions? I think we're, I think. Okay, well, let me, let me, if I may, then I'm going to add one other argument, which is specific to Mr. Jackson, I've only got 15 seconds left, you know, I'm going to cite Carter as well, Mr. Jackson was given a mitigating role reduction 3.3B1.2B. We believe it should have been a minimal participant, a four-point reduction under 3B1.2A. In light of the fact, within the transcript, all Mr. Jackson did is, he's the, he's only charged in the Vicar count, he's not charged in any other count, he was present at some meetings and he allegedly drove off in a stolen bicycle. Any, the assertion that he was involved in the shooting is not supported by the, is not supported by the transcript. I can, my time is up, Judge, I can. You know, you all have a tough job in this case to talk for just a small amount of time, but I feel like I have to keep us on schedule in order to maintain some degree of a schedule for the morning and also be fair to everybody, so I'm sorry. Okay. You can finish your sentence. I can't remember, you probably can't remember what your sentence was. I was not exactly, but I was arguing that it should have been a four-point reduction under 3B1.2A as opposed to two-point reduction under 3B1.2B, which he was granted. I think the transcript supports, I think it was clear error, the assertions made by the government, I think, are not supported by the transcript, which... Is it an interpretive reading that you need of the transcript? Well, I think it's, I think it's plain on the face of the transcript that he was not involved, they're saying vague language, he was involved in the shooting, he was not involved in the shooting, he arrives after this event occurs. And rides a bike away. Pardon me? Rides a bicycle away. Yes, he does drive, well, this is a different context, he does drive a stolen motorcycle. I think he's a minimal participant, he's, I think, the least culpable of all the people, and I think he should have gotten the four-point reduction. All right, Ms. Burton. Good morning, Your Honors, may it please the Court, Delphia Burton, and I represent Brian Sorrell in this matter. First, I'd also like to let the Court know that I do have a motion pending before this Court for remand to the District Court concerning a Brady issue. There was one Brady issue that was raised on appeal before the District Court, and then another that surfaced, I guess, about two years after the trial. So I'm asking the Court to be mindful of that as well. I'd like to utilize my time not necessarily to duplicate or be redundant as it relates to RICO. I know that Mr. Brown did not have a sufficient amount of time, and he does have an ability to come back before you on rebuttal. However, I do want to address a few of the Court's concerns. Judge Cook, you indicated that the Phantoms had bylaws, but it's clear from the record that those bylaws were not followed in any form or fashion by anyone. At times they were, at times they weren't, so those weren't foundational in terms of the... But that is... Sorry, go ahead. But that is evidence from which a jury could conclude that there was a purpose, which was the point of the discussion, correct? Whether they were followed or not was probably presented to the jury, and the jury could make a determination. Yes, but the bylaws never indicated the purpose was to commit crime. And so when you say it's a purpose, that purpose was never... Well, one of the things that the government showed at trial, or it seemed to show, is that, look, there were, as your co-counsel just said, there was plenty of violence involved. And that one of the, whether it came out of the bylaws or elsewhere, was this idea that you stand by your brother essentially, and that if someone gets in a fight, you're in it too. And so why wouldn't all of that together support the purpose? Well, because they were arguing that the purpose was violence, it was stealing cars, that was not the purpose of the phantoms. The phantoms were a social organization in terms of they were riding bikes. They took two incidents, your honor, and basically blew it up. They took September 9th incident and September 23rd incident, and then tried to say that some local guys who are having some brazen brawls, they turned it into a federal fiasco. That is not what the purpose of recall was going to be. I understand your beef, but why isn't that up to the jury ultimately? If they put those facts in front of the jury, why isn't that a jury call? That's what I'm not following. Well, because if you look at those individual crimes, you still need to get beyond the fact of what the purpose is, because there are other criteria that's necessary in terms of establishing an enterprise and what the enterprise stood for. When you look at whether or not the enterprise, even if you say that it is, then how did it affect interstate commerce? That's a big factor. And you look at the individual crimes that were noted. You have robbery, which there's no robbery, in terms of a legal definition. And that's the distinction, your honor, here, because you have things that were done, but they didn't meet the legal standard in terms of the jury, as you had noted, was responsible for applying the facts. But the facts have to be applied to the law. And in Michigan, it didn't fit in terms of for robbery. Are you contesting that the RICO instruction was inaccurate or incorrect? No, I'm not. I'm saying that the evidence was insufficient as it relates to robbery, which there was never an intent to permanently deprive. They were just taking rags. They were taking vests. This was not what Michigan and Ohio and Kentucky define a robbery as, is the intent to permanently deprive. That's an element. If you only have two of the elements and you don't have a third, then you don't have a sufficient basis for a robbery or an extortion. And I'm sorry, I'm lost. So they were taking the rags and vests and hanging them on the wall. Did they intend to return them? In almost all of the instances, those rags were returned. And those were cited in my brief. But the jury knew all of that and made a determination. That's where I'm struggling. In other words, they were correctly instructed on the law. There was facts from which they could conclude that they were depriving others intentionally of property. And the jury made that call. They made that call, but I submit to the court that it was an incorrect call. It wasn't sufficient legally. Did you have a number of individuals who were grouped into one category, such as what we've done today, which doesn't result in any type of fairness and representative of what the criminal justice system is supposed to be about? I'm not looking at each individual, but specifically where I'm running out of time, I want to talk about mere presence as it relates to Brian Sorrell with the conspiracy to murder. None of the witnesses even testified that there was a conspiracy to go and commit an assault with a dangerous weapon. They said that there was an intent to go and take rags. And so, you know, there's a lot that we're inferring because there are a number of people that are involved, a number of things that are going on. But if you look at what each individual was doing, it's sufficient as it relates to the government's position in terms of what was presented at trial. And I'm out of time. Ms. Stiff? Good morning, Your Honors. Katie Stiff is here on behalf of Mr. Schimante. And I'm going to start by talking about how this relates to Mr. Schimante in this case. We've heard a lot talked about this is generally, this generally comes down to a grouping of individuals. Mr. Schimante is not like the other co-defendants in this case. That's the distinction that I want to make to this panel. He was not part of the Detroit chapter. He was part of the Pontiac chapter. And significantly, particularly as it comes down to his sentencing issues, the court combined him with the other members that were doing all of these terrible things. Going out and murdering people, going out and stealing motorcycles, shooting. What I'd like this panel to consider is that the trial court erred in doing that. First of all, the trial court clearly erred when it concluded that Mr. Schimante was involved in the interstate sale of stolen motorcycles. Now, the government says that there's sufficient evidence to link Mr. Schimante to the sale of these stolen motorcycles, the interstate sale of these stolen motorcycles, because of the testimony of Mr. Valdez at trial. Now, to respond to that, the testimony there was that apparently Mr. Schimante was selling stolen parts on eBay. That's what Mr. Valdez said. There's no other outside evidence that was offered to support those claims. There were no receipts of sale from eBay parts. In fact, Mr. Schimante... I take it that you cross-examined that witness who said he was selling... Well, I did not, because that was not trial counsel. That doesn't work here. But the cross-examination had to be fruitful. Somehow counsel was able to convey to the jury that this gentleman was from a much more peaceful tribe? That's correct. And the jury handled that? Yes. All right. So what can this court do against the insufficiency? Yes. So I'm dealing specifically with the sentencing issue, actually, on this. So I would ask that this panel would find that the trial court judge clearly erred in saying that Mr. Schimante should get points, essentially, for being involved in this sale of the stolen motorcycles. And it's important also to note that Mr. Schimante was attributed with stealing between $70,000 and $120,000 worth of stolen motorcycles. When he was sentenced by the trial court. The only thing that we know is that he helped some other members load an allegedly stolen motorcycle onto a truck, and then he drove it across state lines. So what we have is that he's driving this truck and allegedly helped them load a motorcycle. There's no indication that he knew that this motorcycle was stolen. There's no indication that he was involved in the theft of this motorcycle. And also, what we do know is that from trial testimony, Mr. Schimante didn't even possess a stolen motorcycle himself. He drove his own legal motorcycle. He was not one of these individuals that was routinely involved, like some of the others were, in the theft of stolen motorcycles. Moving on, as it relates to the firearm that he had supplied to Mr. Frazier previously, legally, the trial court erred by not having a specific finding as to whether it was reasonably foreseeable to Mr. Schimante that this firearm, at some point in the future that was legally given to Mr. Frazier, would be used in an assault. I would argue that Mr. Schimante had done this not as it relates to the Phantom Motorcycle Club. He had given it to Mr. Frazier legally, outside of the purpose of the Phantoms, and that it is not reasonably foreseeable to Mr. Schimante that this would have been used. All that the court said on page 24 of the sentencing transcript, I'll finish up with this, was that Mr. Schimante was a Phantom, Mr. Frazier was a Phantom, I'm going to leave that in. This is specific proof that Mr. Schimante has been lumped together with all of these other co-defendants and has taken the brunt for that. Thank you, Your Honors. Good morning, Your Honors. Mark Chastain for the United States. There have been a lot of issues briefed and presented to the court in the briefing today, so I want to make sure I get to whatever the court finds most interesting or has trouble with. But unless you give me some direction where you'd like me to start, I will start with... I don't care when you address this, but at some point during your argument, I would like for you to address Mr. Brown's arguments and Mr. Schimante's. Mr. Brown's arguments with respect... He raises several, so is there one in particular you'd like me to make sure we get to? Because I'll start with that. The sufficiency of the evidence as to Mr. Brown. Well, I think with each defendant, we should probably bear in mind what the evidence showed in the case in terms of their involvement in the Phantoms and their activities. So what the jury heard with respect to Mr. Brown, who was also called Tank, is that he was involved when the Phantoms went to Cleveland from Michigan in 2009 to surround the Zulus clubhouse with firearms and essentially extort a concession to allow the Phantoms to expand into Cleveland. He was present when the Phantoms raided the Hell Lovers party called the Bridge the Gap party in January 2013 and then isolated a Satan Sidekicks member, beat him up and stole the rags. He was in Kentucky during the fight with Hell Lovers during the national meeting or national call out of the Phantoms at which Hell Lovers were beaten and robbed of their rags. He was present for the planning meeting prior to Leon McGee's attempted robbery and shooting. He went to the scene with others and so he was a full participant in that. It looks like he left before the actual assault happened. As for the murder conspiracy, which he was specifically charged, he was present at the meeting which I think, and I apologize, but I think some or all of you have mentioned this meeting that happened right after or shortly after Stephen Caldwell, known as Shoe Boots, was killed. At that meeting, a Phantom named Herc told everybody present, if you're not down with the murder game, put your rags on the table and get out. Very clearly at the outset of this meeting that this meeting was going to be about how to conspire to commit murder. Mr. Brown was present at that meeting. There isn't conflicting testimony, as counsel said. In fact, the record states that Mr. Brown was there and I don't believe he's pointed to any conflicting testimony showing otherwise. Even if there were, the jury could find credit that he was there. That is consistent with his later conversation with Marvin Nicholson and Carl Miller, which was recorded. During that conversation, Mr. Nicholson, Carl Miller, and Mr. Brown were both present. They talked about the ongoing murder plot, Antonio Johnson's plot to kill hell lovers, the ongoing effort to find those responsible for the murder of Stephen Caldwell, and what they're doing about it. Now, I just want to say, counsel has said that it's clear that Mr. Brown is inebriated or drunk. There's nothing in the record for that. He's asking this court to substitute its judgment for the jury, which heard that recording, and come to its own conclusion that Mr. Brown was inebriated. Mention or walk through the argument that there was, by the district court, confusion between the Browns. It's true that the district court used the wrong name in its ruling, but of course that's not really relevant to this court in that this court makes its own de novo review of the record when deciding a sufficiency of the evidence record. There wasn't attributing to one individual named Brown versus this individual named Brown. I think there was some confusion by the district court about that. What about that? Is that pertinent? No, it's not, because again, this court makes its own determination of the evidence. As we've laid out in our brief, and I know counsel appears to be confused by the brief, it's very clear in the context who the government is talking about when it says Brown. Sentence to sentence and paragraph to paragraph, which Brown is which. In any event, it's easily resolved by referring to the page sites and the record cited in our brief about which Brown it was being discussed. Turning back to the conversation with Marvin Nicholson and Carl Miller, where they're discussing the ongoing murder plot, Mr. Brown says that his view is that they should hit them hard as hell. Now this is another instance in which counsel has asked this court to put its own interpretation on the facts rather than giving deference to the jury's finding, which it's required to do. Carl Miller said when he was explaining his interpretation of what Sherman Brown was saying there was that he meant to go at them full club on club. Meaning no holding back, go full out 100% phantoms versus the hell lovers. Mr. Paulson asked this court to interpret that to mean that Sherman Brown meant just a fist fight or a rumble. But that's of course his interpretation of it and not one that the jury would have to find or make. He also says that Miller's interpretation is inconsistent with the plot, and I'm really struggling with that argument because I fail to see how an interpretation that the phantoms should go 100% against the hell lovers is inconsistent with a plot to completely wipe out the hell lovers by luring them to Michigan first by murder of three of them and then hitting them at the funeral. It just doesn't even make sense, that argument, much less is it one that the jury was required to make. So as far as the sufficiency of the evidence for Sherman Brown, I think the evidence is overwhelming that he was an active participant in the phantoms, that he had repeatedly shown up and been present for collective actions in violence that the phantoms had done over the years. So when he is present at a meeting to plot the murder, in which Antiono Johnson says this is what we're going to do, and then subsequently discusses that meeting and the plot with his fellow phantoms, the jury could reasonably find that he had agreed to the murder conspiracy. And then, I apologize, Judge Gidney, you asked about another... I asked about Mr. Schimonti, but I want you to be sure you get to argue the points you want to argue, as opposed to... So you determine what you need to do, and if you have time to come back to Mr. Schimonti, I'd appreciate it. Well, I'll just briefly sort of recap with Mr. Schimonti, and if that doesn't cover it, please ask for more, because I'd be happy to provide it. I'm specifically referencing his sentencing argument. Okay. So the district court, I think there's sort of two things that Mr. Schimonti has advanced on appeal over the 27 objections that he raised to the pre-sentence investigation report in the district court. And the two main things that we've heard about are that he was involved in motorcycle, or stolen motorcycle trafficking, and the district court's conclusion that it was foreseeable that Mr. Frazier would use the firearm that Mr. Schimonti provided. So let's turn to the motorcycle trafficking question. As counsel concedes today, Mr. Valdez testified that he saw Mr. Schimonti engaging in selling stolen motorcycles. That's in the record. She also concedes that he was involved with other phantoms in transporting a motorcycle to Kentucky. She said it's not clear it was stolen, but in the transcript and the record, in fact, it was clear that it was a stolen motorcycle that they were transporting to Kentucky. The district court could certainly find by a preponderance of evidence that Mr. Schimonti was a knowing participant in the phantoms trafficking in stolen motorcycles. As far as the firearm, there was abundant testimony that Mr. Schimonti was actively providing, in fact, he admitted this to Agent Marsh after his house was searched, that he was providing firearms to his fellow phantoms, and although he often wasn't paid for them, he received credit sort of as being a good guy and a good phantom member for providing those guns. Many of those guns had obliterated serial numbers, which you would only do if he obliterated the serial number. You would only do that if you know you're giving it to somebody either who cannot possess it legally, a felon, or that it's likely to be used in crime, because obliterating the serial number is an attempt to prevent it from being traced after the fact. As I said, the evidence showed that he knew he was giving firearms to phantoms who were not permitted to have them, felons, that he knew were felons. His background with the phantoms would show that he could reasonably foresee that his guns that he was providing would be used in violent acts. For example, he was present at the Bridge the Gap party in 2013, and in fact took a picture, a selfie I guess, with the stolen rags. The evidence showed that many of the phantoms had firearms at that party, and that's in fact how they prevented the attendees of the party from getting to the room where they were beating up the Satan sidekick and taking his firearms. He was present at the assault and the robbery in Kentucky, so he would know that the phantoms used violence in mass ways then. All of this shows that Mr. Chiamonte, given that he's providing illegal guns to people who cannot legally possess them, to members of a club that he knows commits violence and often uses firearms in its violence, made it reasonable for the district court to conclude that he would reasonably foresee that this firearm would be used. So if I could turn to then Mr. I'd just briefly like to address Mr. Brown's argument with respect to the enterprise and his claim, an argument that the government showed was a series of small conspiracies, and I think the members of the court hit on this pretty clearly, that Mr. Johnson in fact ordered almost all of the violent acts that the jury heard about in this case. The surrounding of the Zulus, he ordered it and he was present. He ordered the omen hunt in 2010 when he was disrespected, where members of the phantom went and found the leadership of the omens and robbed them of their rags at gunpoint. He ordered the Black Bottoms Club shut down. He ordered the raid on the Bridge of the Gap party. He ordered the hunt for sidekicks that resulted in Leon McGee being shot in 2013, and he's the one who instigated the murder conspiracy and advanced it himself. This was an overarching, all of these acts were connected to the enterprise that Mr. Johnson was the national leader of. There's simply no way that anybody could reasonably say that it was not rational for the jury to find that there was a purpose of the phantoms and that these acts were connected to the enterprise. Turning to... I'd like to just briefly address the reliance by Mr. Brown on the 2014 committee notes as to the timing when a challenge to the jury veneer needs to be brought. The committee notes specifically say that they did not change any of the prior timelines for when motions need to be brought. In addition, the rules that were being applied by this court in the Hoffa case in 1965 also said before trial. So the representation to this court that they were very different isn't really, I think, sustainable by actually looking at the rules. They clearly say the 1944 rules, which were in effect in 1965, said that those motions needed to be brought before trial. So there really wasn't a difference. Why wouldn't we treat trial the same for jeopardy purposes and other purposes? Because the rule just says before trial and we've treated the start of trials  the same for jeopardy purposes. Why wouldn't that be consistent? Well, that's true for some motions. It's not true for all. What do you mean that's true for some motions but not all? Well, for instance, a motion to suppress that is brought after maybe untimely and a district court could determine that. Sure, and the rule says if the district court sets a deadline, but they didn't here, right? They actually did, and this is something that did not come out in the briefing. There was a docket entry on July 29th of 2014 in which Judge Borman extended the preexisting motion cutoff line to July 30th, 2014 to allow the defense to file some additional motions. But the information wouldn't have been available to them at July 30th, 2014. Well, it depends what information we're talking about. Regarding the veneer, because by my notes they got that in December 18th, 2014. This specific draw, that is true, but the motion actually should be brought based on the jury wheel that's drawn by the district court and the clerk's office. That was done in order pursuant to a 2013 order. And that's because the case law says you're not talking about the specific pool you got on a specific day. That's correct. The way in which the entire group of eligible jurors for a given time period is selected. That's correct. And they had that available to them by the deadline in July? I believe all that publicly available information was available then. In any event, they certainly made no showing that they attempted to go to the clerk's office and could not obtain that information about the jury wheel, the master wheel and the qualified wheel from which their veneer would be drawn. And I would note that Judge Borman actually did enforce this motion cutoff during trial. Why isn't that your best argument? It probably is, Your Honor, and I apologize that we didn't raise it, but he did have a motion cutoff. But I recognize that this was not raised before a response to this Court's question. Because the rule provides in the alternative, correct? It does. And of course this Court can affirm on any basis that it's supported by the record. And I'd be happy to give the record site where Judge Borman in fact enforced the motion cutoff himself when Mr. Nicholson attempted to file a motion to suppress the day before jury selection was about to begin. He's citing that July 30th motion cutoff date. He denied that motion solely on the grounds that it was untimely. That's record number 398, page ID 1815. Turning to the Remmer hearing, Judge Lepar, you had it right when you asked Ms. Raymond whether Judge Borman actually asked what she said he asked. She said he asked, you didn't think the defendants had anything to do with this, do you? Or you don't think that? That's not what he asked. What he asked is what you said, and that is, he instructed them, do you understand the defendants don't have anything to do with this? And the defendants want to say that that's not sufficient. How did he know that? I think it was pretty clear from his questioning of juror number 11, this came after he had questioned juror number 11, that this was really a non-event. Juror 11 had been followed from the court, he thought, to this gas station. But there were no gestures towards him, nothing was said to him. When he left that gas station and went across to another shopping center, that car also left the gas station but did not continue to follow him. And I think what Judge Borman was saying is, look, we've looked at this and this is really nothing. But he's going to do what Remmer says, given that juror 11 had mentioned this to his fellow jurors. So he's going to make sure that they understand that the defendants had anything to do with this. We trust jurors to follow a district court's instructions, and that's what he's doing here. I would submit that asking them, do you think, would suggest to them that it's possible. And sort of give the district... I understand the dilemma he faced in wording the question. And once he'd satisfied himself that the defendant didn't have anything to do with it, that would be why you would state it affirmatively. But I was curious. Obviously he didn't go out and investigate it. He had questioned juror 11 and investigated it within the confines of the courtroom and determined that...that's reflected in his later orders where he says there was no contact. Did the juror know it was someone who had even been in or around court? There's nothing that suggests that it was somebody that he recognized as being around the courthouse. And of course the ultimate question is one that Judge Borman did ask, and that is whether the jurors, having learned of this information from juror number 11, could be fair and impartial. And every single one of them said they could, except the one who said she might have some concerns, and she was excused from the jury. Judge Borman made a credibility determination after questioning each juror in person, and his credibility determination is entitled to deference from this court. Credibility with respect to can you be fair? Right. On the aloneness issue, again I think this is really, in the district court in here, was sort of a much ado about nothing, because Mr. Pitts is right. I am going to point out that in fact the instructions did tell the jury, ultimately, exactly what they wanted the jury to be told, other than they weren't told anything about free speech or the invocation of the First Amendment. The jury was told that Michigan conspiracy law required that the jurors, excuse me, the defendants had the specific intent to commit the crime, or help commit the crime that they were conspiring to. And that's essentially what they're asking, or were asking the district court, is to tell the jury that they had to have the subjective intent to commit the crime. But in any event, as we point out in our brief, evidence of statements made to show the existence of a conspiracy are not subject to First Amendment protections. The case was very clear on that. This court's decisions in Amaui and Jeter say that, and Alonis didn't change that in any way. Alonis didn't even relate to a conspiracy case, correct? It was a threats case? It was a threats case. Could I just address briefly this Carter case that Mr. Paulson has introduced today? It's an unpublished opinion by this court, talking about an amendment that was made to the guidelines on the mitigating rule question. And in Carter, the court found that those amendments were retroactive, and because they had been issued after sentencing for the defendant, and after the appellate briefs had been filed, that he essentially should be allowed to go to the district court to reconsider on remand. In Carter, the defendant had sought a mitigating rule reduction. That is very different from Mr. Brown, who never sought one from the district court in the first place. In any case, both Mr. Brown and Mr. Jackson's briefs in this court were filed well after the amendments went into effect in November 2015. They've simply shown no reason, no good cause for their failure to raise this issue before today at oral argument. So you're saying it's waived? I think it's waived. This court has repeatedly said that arguments not made in an opening brief are waived, that arguments not made in a reply brief are waived, and arguments raised for the first time in oral argument are waived. They've waived it. I just wanted to clarify something, too, that Ms. Burton said, that one of her Brady issues was raised in the district court. I think she was referring to a claim that medical bills that were submitted by the government in support of a restitution claim. That, in fact, was never raised in the district court either. Neither of her Brady claims has been previously raised. She has filed now a motion for a new trial in the district court, hence her motion for a remand from this court. But I don't think either one of those issues need to be dealt with by this court. They're now before the district court. But in any event, as we point out in our brief, certainly the medical bill issue is a really meritless issue. There's just no chance that that evidence would have convinced a jury not to convict Mr. Sorrell of shooting Leon McGee when he said multiple times on a recording that he shot Mr. McGee. I don't really have anything more that I think I want to highlight for the court. If the court has anything that it would like to discuss further, I have six and a half minutes left. I don't want to leave it on the table and leave you wondering about it. Mr. Brown. I'm just going to briefly wrap this up and address one of the issues the government, Mr. Chastain, just brought up. Mr. Johnson ordered almost all of the violent acts, and he outlined some of them for you. But there's a lot of things going on in this case that Antonio Johnson did not order and did not have knowledge of. And if you're the national president of this organization, then you don't let members steal motorcycles for their own benefit and profit the money, and you don't let them traffic in firearms and profit for their own use and benefit. RICO is designed to target organized crime. If you look at the facts in this case, these guys are anything but organized. And so that's why I'm going to ask to remember what Turcotte instructs us. Simple conspiracies do not qualify as a RICO case. And that's why I'll ask you to reverse all defendants' convictions and my client, Antonio Johnson, as well. Thank you for the opportunity to be here. I'll take the rest of the time that he just left on the table. I've got a lot to cover very quickly, though. As to the conspiracy for Mr. Sherman Brown, the timing is important. The government's indictment alleged a conspiracy from September 27 to October 23, 2013. This court's decision in the United States v. Page says that mere knowledge of a conspiracy to commit murder is not enough. You have to do something. You have to give assent. And the statement that if you don't like murder, get out of here, no rational person would leave at that point. That's saying, no, I'm going to go to the cops. You can shoot me on the way out. That can't be the rule. And as to what the conspiracy was, I invite you to read in the transcript 441, page ID 287477. And then there's summation at 657, page ID 8404. They talk about what the conspiracy was. It was to kill one or two people, get the club together, and then go in and kill them all. Mr. Miller, I'd invite you again to read his discussion of that. He says, no, no, Sherman Brown wasn't talking about – let's see, I need to – I can read that to you. He's not talking about this setting up an ambush. He says, hit the lovers hard instead of sitting back and meticulously waiting for one or two, which is what had been proposed at the meeting. So Mr. Miller decisively says he's not going along with the conspiracy. He says, let's just go fight. And you can read that as you will, but I think Mr. Miller's pretty clear that Mr. Brown is not part of the conspiracy. As to the veneer issue, first, the cutoff date, I did look at this when we were doing the initial briefing, and I was pretty sure it didn't apply to this kind of motion, which is why I didn't talk about it. Nobody talked about it. I don't remember why I thought it was irrelevant, but I'd be happy to file something if the court would like it on this cutoff date. The 1944 rules are very different. If you look at 12b-3 from the 1944 rules, they're very different. He's talking about the statement that we didn't change the rules. That's in the 2014 change, and I'm pretty sure that the change from the 1944 to the new rules happened before 2014. And then finally, I'd invite you to look at Gomez, United States v. Gomez, which says we have to look at the constitutional right at issue when we're determining when trial starts. And I think, I guess I should probably move on. Last issue is Carter. They say that we waived it. It came out after our opening brief. It came out, I think it came out after our plenary. I'm not sure about that. But they raised the Hoffa case just a couple days ago. I can file a 28-J if it would help on that, but I only discovered the Carter case yesterday. I sent an email yesterday with the case. It's really straightforward. Your Honors can read it and apply it as you see it. Thank you very much. Ms. Rybin. If I understand the government's REMER response correctly, they're conceding that Judge Borman had already decided that what the juror had reported was nothing, and that the judge proceeded then as though no juror would be concerned about what this particular juror had reported. He had already told everyone had happened. That might explain the way Judge Borman actually phrased the inquiry to the jurors, because he had already decided there was nothing to this. So that means the defendants got the appearance of a REMER hearing, but not the reality. And if that's the way the government thinks this played out and this Court agrees, then this case should be reversed. Thank you. Well, we appreciate very much all of you, the defense attorneys, accepting appointment in this case. Representing any criminal defendant is hard, but representing defendants in a case of this type is particularly hard. And we are just very grateful to you for accepting the appointments and for your zealous and effective advocacy on behalf of your clients. All of you will consider the case carefully, and thank you for your argument.